

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-10-00199-CV**

IN THE INTEREST OF O.E.W.-K.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Mother appeals the trial court's order terminating her parental rights to her son, O.E.W.-K. In eight issues, Mother challenges the legal and factual sufficiency of the evidence regarding the trial court's endangerment and best interest findings. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

The trial court made 120 "findings of fact." They are primarily recitations and summations of testimony presented during trial. Because Mother challenges the legal and factual sufficiency of the evidence to support the grounds argued for termination and the best interest finding, we incorporate the trial court's findings of fact into our detailed recitation of the evidence presented in this case. We attempt to present the evidence in chronological order.

### A. Mother's Background

While living in Washington, Mother gave birth to O.E.W.-K. on June 12, 2003, and they later moved to Texas. As set out in more detail below, Mother had a difficult childhood that included alleged sexual abuse by her grandmother's husband; she also struggled with suicidal and homicidal thoughts; engaged in self-mutilation; participated in a gang prior to O.E.W.-K.'s birth; used drugs before and after O.E.W.-K.'s birth; spent time in jail for drug-related charges; refused to address her mental health issues; yelled at, threatened, and hit other adults, including her grandmother; bruised O.E.W.-K.; and demonstrated poor parenting skills.

### B. Mother's Actions at O.E.W.-K.'s School

#### 1. Threatening and Hitting O.E.W.-K.'s Teacher

Ferrell Yeokum, O.E.W.-K.'s elementary school principal, testified that during the first few weeks of school in September 2008, Mother had grabbed O.E.W.-K.'s kindergarten teacher's wrist on at least three occasions and had

---

[2]We recognize that some of the testimony is conflicting and inconsistent. This factual background section of our opinion, however, sets forth the testimony given, even when it is inconsistent.

made other threatening moves toward her. Mother also threatened to slit the throat of anyone who touched O.E.W.-K. Yeokum was present when Mother said that she was "waiting to kick [O.E.W.-K.'s teacher's] ass." The police came and interviewed the teacher, but no ticket was issued to Mother.

Because of ongoing problems and continuing concerns with the way that Mother was handling O.E.W.-K.'s original kindergarten teacher, Yeokum handed Mother a letter two weeks after school started. The letter stated, among other things:

> We regret to inform you that we're taking the following safety precautions in response to your recent behavior on campus, which includes physical contact with a staff member, use of profanity, and disruption of the school environment.
>
> Effective immediately, you must follow these procedures when visiting our campus. Enter the campus only through the front doors. Drop off and pick up your student at the front office only. You are restricted from entering the cafeteria at drop-off or pick-up times. You are required to have an administrator escort you while in the building. A call in advance is preferable to be sure we have an administrator on duty. You are not permitted to contact your son's teacher directly. Please send any communication directly to administrative staff. We will forward them to the teacher.
>
> These safety precautions will remain in effect indefinitely, and if you choose not to follow each of them, we will immediately involve law enforcement.

Three Fort Worth police officers were present at the meeting when Yeokum handed Mother the letter.

As a result of Mother's actions toward O.E.W.-K.'s original kindergarten teacher, Yeokum moved O.E.W.-K. to a different teacher's room in an attempt to preclude future incidents and to make sure that everyone was safe. The

3

situation improved for a time, but then it became evident that Mother seemed to have a romantic interest in the assistant principal because she was sending gifts to her in O.E.W.-K.'s name. Mother brought a knife to school and exhibited it to the assistant principal and admitted to Yeokum that she had brought the knife and had opened it at the school. Based on the school administrators' concern over these situations, they decided to issue a criminal trespass warning to Mother and had O.E.W.-K. removed from the school.

Yeokum felt that Mother cared for her son, and Yeokum wanted to help her "navigate the waters" because she seemed to have some difficulties knowing what the rules and procedures were. They had a good working relationship from September 8, 2008 through the end of January or early February 2009. During that time, Mother told Yeokum that she had been in a gang for a number of years, that O.E.W.-K.'s father was the leader of the gang, and that they were raising O.E.W.-K. to become a member of the gang. Mother said that she had been in jail on drug charges. When Yeokum told Mother that O.E.W.-K. was a very smart young man, Mother responded that she was surprised to learn that "because when she found out that she was pregnant, she had been taking drugs, and she wondered if that was going to affect his intelligence."

### 2. Smoking Marihuana in the Car with O.E.W.-K.

David Piercefield, a physical education aide, testified that he walked O.E.W.-K. to Mother's car one day and saw her smoking a joint. Piercefield testified that he was concerned for O.E.W.-K.'s safety and for the safety of other

4

students because the middle school was letting out its students and because Mother was "known to not be the safest driver." Piercefield stayed at the car with Mother and O.E.W.-K. for forty-five minutes to "make sure there was a little wear-off time." During that time, Mother told him that she smoked marihuana every day.

### C. CPS Involvement

#### 1. Jaime Jaco

Jaime Jaco, an investigator for CPS, testified that she was assigned to O.E.W.-K.'s case in February 2009 after receiving a report that Mother had gone to O.E.W.-K.'s elementary school and had taken a knife into the assistant principal's office. Jaco said that during her first contact with Mother, she was very argumentative and combative; Mother made appointments, missed them, and then refused to reschedule. Jaco warned Mother that if she did not come to her appointments, Jaco would go to Mother's house and would bring law enforcement with her; Mother told Jaco that Jaco would be sorry and that she should go ahead and bring the police and see what happened.

Jaco spoke with Ms. Johnson, O.E.W.-K.'s maternal great grandmother, on March 5, 2009. Ms. Johnson said that she had witnessed Mother hit O.E.W.-K. on the head and that she had seen Mother cause bruises on O.E.W.-K. Ms. Johnson said that Mother had slapped her in the shoulder after Ms. Johnson had undergone shoulder surgery; the pain caused Ms. Johnson to go to the doctor, and the doctor told Mother not to hit Ms. Johnson any more. Ms. Johnson said

5

that Mother was violent, that she got loud and crazy, and that she had a dual personality. Ms. Johnson said that ever since Mother and O.E.W.-K. moved in with her, she (Ms. Johnson) became the primary caretaker of O.E.W.-K.; she has fed him, bathed him, and helped him with his schoolwork.

On March 11, 2009, O.E.W.-K.'s teacher reported seeing bruises on him. Jaco thereafter went to Mother's home to make contact with her on March 12, 17, and 24, 2009. No one answered the door on the first two dates, but Jaco was able to meet with Mother and O.E.W.-K. on March 24, 2009. Jaco received a tour of the house from Mother and was informed that in addition to Mother and O.E.W.-K., Ms. Johnson and Mr. Johnson lived there.[3]

While Jaco was there, O.E.W.-K. came in and asked Mother to get something out of the refrigerator, and Mother followed him into the hallway, slapped him on the top of his head, and said, "[W]hat are you, a little girl?" O.E.W.-K. did not fall down but whimpered a little.

During Jaco's visit, she saw a red crescent bruise about one inch from O.E.W.-K.'s eye. The area inside the crescent-shaped bruise was yellow and blue. O.E.W.-K. said that Mother had hit him with a belt. Jaco also saw two, two-inch-long, red, rectangular bruises on O.E.W.-K.'s right arm; a bruise on his hands; and a two-inch-long, blue, rectangular bruise on his right leg. When Jaco

---

[3]Ms. Johnson was not there at the time because she was in Washington having surgery. Ms. Johnson wrote in a letter, which was admitted into evidence, that Mother had whipped O.E.W.-K. inappropriately during Ms. Johnson's absence.

6

asked Mother about the bruises on O.E.W.-K., she initially said that O.E.W.-K. had gotten into trouble but denied that she had physically disciplined him. When Jaco told Mother what O.E.W.-K. had said, Mother went and asked O.E.W.-K. how he had gotten the bruises, and he said that she had hit him. Mother laughed and asked O.E.W.-K. again. When O.E.W.-K. responded with the same story, Mother admitted that she had spanked him with a belt. She said that while she was spanking him, he moved around, and she accidentally hit him in the face. Mother initially said that she had hit O.E.W.-K. because he had been disrespectful to her, but then she said that he had gotten in trouble because he had not been doing his homework.

Mother told Jaco that she had been diagnosed with bipolar disorder, oppositional/defiant disorder,[4] ADHD, and multiple personality disorder. She said that she refused to take medication and to go to a counselor.

Jaco put a safety plan in place at the Johnson home on March 24, 2009.[5] The terms of the safety plan required Mother to not physically discipline O.E.W.-

---

[4]Ms. Johnson wrote in a letter that was admitted into evidence, "[Mother's] Oppositional Defiant Disorder is really not easy for me. Especially, because she won't shut up. It is almost torture watching her rant and rave with little control in areas of reasoning, impulse control, and judgment." Ms. Johnson's letter also states that after she put a stop to Mother's reading books on Jeffrey Dahmer and others, Mother "became aggressive, exhibiting rage toward me for years. She went crazy. Stole my money. Refused to go to school. . . . She was mad at me days, weeks, and years, . . . ."

[5]Jaco also spoke to Mr. Johnson, who said that he was Ms. Johnson's former husband but that they still lived together and were buying the house that they were living in together.

K., to cooperate with CPS, and to follow all of CPS's recommendations. Mother signed the plan but said that she was only signing it so that Jaco and Gary Hill, the CPS investigator, would leave her house. Mother said that she would not work any services, such as attending parenting classes or counseling sessions.

On April 10, 2009, Ms. Johnson reported to Jaco that Mother had hit O.E.W.-K. with a belt. Ms. Johnson also heard Mother tell O.E.W.-K. not to tell anyone about the bruises and to tell his teachers that if they checked him for bruises, she would kill them. Ms. Johnson also told Jaco on April 10 that Mother had used marihuana and had a history of using crack cocaine, including while she was pregnant with O.E.W.-K. Ms. Johnson said that Mother continued to use crack cocaine after O.E.W.-K. was born.[6] While Mother was using drugs, she left O.E.W.-K. alone, and he was removed by CPS in Washington State and placed with Jamie Johnson, who was his great uncle. Ms. Johnson said that Mother's current routine included sitting at home and watching television all day; she refused to go to the store or do anything else.

On April 15, 2009, Ms. Johnson called Jaco and said that there had been an incident that morning when Mother had acted violently toward O.E.W.-K. After he told Mother that he was sick and did not want to go to school, Mother got upset, grabbed him, and pulled him. Ms. Johnson said that she was fearful that

---

[6]Ms. Johnson later clarified that she was not saying that Mother was using crack cocaine at that time (on April 10, 2009). Jaco did not administer a drug test to Mother, so she was not aware of whether Mother was using at that time.

Mother was "really going to hurt him." Jaco heard Mother yelling in the background: "No one is going to tell me I can't hit my son. If I want to beat him, I'll beat him, and there is nothing you can do about it."

On May 20, 2009, the Texas Department of Family and Protective Services (hereinafter TDFPS or the Department) removed O.E.W.-K. from Mother's care. After TDFPS removed O.E.W.-K., Ms. Johnson said that she realized that he had caused the bruising himself. Ms. Johnson said that O.E.W.-K. would not be in foster care for long because she was going to tell the judge that O.E.W.-K. had caused the bruising himself and that his teachers had been lying about Mother. Ms. Johnson told Jaco that she wanted to be considered as a placement for O.E.W.-K., but she did not want Mother to move out of her house.

### 2. Gary Hill

As mentioned above, Gary Hill, the CPS investigator, worked with Jaco on O.E.W.-K.'s case. Hill met Mother on March 24, 2009, and she told him that O.E.W.-K.'s father was Jean K. and that he did not pay child support.

Mother said that she had been incarcerated in Purdy, which is the State of Washington's Women's Correctional Facility, after being arrested at age fifteen for possession of a controlled substance and then tried as an adult for the crime. Mother said that she served five years.

9

Mother told Hill that she had used marihuana while she was pregnant with O.E.W.-K. but had stopped using during her third trimester. Mother said that she lived with Ms. Johnson and that Ms. Johnson helped take care of O.E.W.-K.

O.E.W.-K. was present during Hill's visit with Mother, and they talked about O.E.W.-K.'s current injury to his face. O.E.W.-K. said that Mother had caused it.

### 3. Joanna Letz

Joanna Letz, the first CPS caseworker who was assigned to O.E.W.-K.'s case in May 2009, testified that when she met with Mother on June 2, 2009, Mother told her that she had been accused of attacking O.E.W.-K.'s teacher in February 2009. Mother said,

> I'll tell you exactly what happened was the teacher had put a mark on his hand and that constitutes, to me, that's a deterrent to me that it is the mark of the beast from the Bible, and it made me very angry, so I went in and I grabbed the teacher by the neck, shoved her up against the wall, and told her don't you ever touch my son again.

On June 11, 2009, Mother called and asked Letz questions about a family group conference because her attorney had advised her that she should have one. Letz told Mother that a family group conference can be helpful but is not mandatory, and Mother said that she did not want to have one because she thought it would just be a "b[---]h-fest" and because she did not want to have to see Jaco.

On June 16, 2009, Letz gave Mother a family service plan and went over it with her.

10

On June 30, 2009, Letz and her supervisor met with Ms. Johnson to explain why she would not be undergoing a home study for placement of O.E.W.-K. in her home.[7] They explained to Ms. Johnson that there were fifty-eight cases of CPS allegations in the home while the family lived in Washington. Ms. Johnson indicated that all of those allegations were Mother's fault and that she had "bad blood" because she was always in trouble, was very defiant, and was disrespectful.

Letz questioned Ms. Johnson about whether she had ever thrown a computer at Mother because that is what Mother had told Letz, but Ms. Johnson said that although she had gotten very mad because Mother had hurt her feelings, she had dropped only a keyboard over the top of the stairs.

Letz also questioned Ms. Johnson about Mother's allegations that Mr. Johnson had sexually abused her, and Ms. Johnson said that she had asked Mr. Johnson about the allegations and that he said that he did not do anything. Ms. Johnson believed him.

Ms. Johnson said that her daughter Rosalyn (Mother's mother) had also made allegations about sexual abuse by Mr. Johnson and had made an outcry at

---

[7]The record reveals that a home assessment was ultimately conducted on Ms. Johnson's home. Letz testified that although O.E.W.-K. had stayed with his great uncle Jamie for one or two years while Mother was incarcerated in Washington, Letz did not conduct a home study on Jamie because paperwork that she had received showed that his wife had a criminal history involving drugs. Letz learned that Jamie had spent time in prison for a conviction for breaking into a home.

school; Mr. Johnson admitted to touching her breasts. When Letz questioned why it would be hard for Ms. Johnson to believe that Mr. Johnson had sexually abused Mother if he had sexually abused Mother's mother, Ms. Johnson said that she did not know what was the truth, but she did know that Mr. Johnson had sexually abused Rosalyn because he admitted to it.

Also on June 30, 2009, Ms. Johnson stated that she suffered from fibromyalgia, diabetes, osteoarthritis, and mixed connective tissue disease. She said that seventeen years before, she had been a drug user.

On July 1, 2009, Mother visited the CPS office. During the appointment, Mother said that if she were tested for drugs right then, the test would be positive because she had been smoking pot. Mother admitted that it "was really stupid on [her] part" to be smoking pot when she had a CPS case pending. Mother also gave an update on her progress with the service plan and said that she had been attending parenting classes and had learned different ways to deal with O.E.W.-K. other than spanking him.

On August 12, 2009, Mother came in to the CPS office and said that she had a pretty bad weekend and had been cutting again; she showed Letz her self-mutilation marks. After that episode, Letz frequently asked Mother about self-mutilation and did not see evidence of any additional cutting episodes.

Mother's service plan required her to attend anger management classes, parenting classes, and individual counseling and to obtain a psychosocial assessment, a drug assessment, a psychological evaluation, and a psychiatric

12

evaluation.  Mother completed a psychological evaluation, parenting classes, and anger management.  At trial, Letz was not aware of whether Mother had completed individual counseling because the case was transferred to Ruth Groomer on September 30, 2009, while Mother was still working her service plan; Mother did not like the counselor she saw for individual counseling, so Letz had set up counseling for Mother with Connie Burdick.  Mother had also not completed the psychiatric evaluation at the time the case was transferred.  Mother tested positive for drugs one of the two times that Letz drug tested her.

### 4. Ruth Groomer

Groomer, who became O.E.W.-K.'s caseworker after Letz, did not believe it would be in O.E.W.-K.'s best interest to testify in the courtroom.  She said that it would cause him stress because he had a lot of fear of Mother and Ms. Johnson.

At the time of trial, O.E.W.-K. was repeating kindergarten.  Groomer knew that there were some issues with O.E.W.-K.'s grades, that he was struggling, and that he had required special attention.  When O.E.W.-K. first came into care, he took speech therapy and no longer had a problem being understood; Groomer said that O.E.W.-K. did not have any physical problems, but he had some behavior problems at school and at times other than Tuesday afternoons after his visits with Mother and Ms. Johnson.  Groomer was aware that O.E.W.-K. "tried to slit some kid's throat," and she was sure that he did not hear about behavior like

13

that in the foster home. Groomer believed that O.E.W.-K.'s previous environment was a direct reflection of his current behavior.

Groomer testified regarding Mother's compliance with her service plan. Mother was required to and did undergo a psychological evaluation. Mother completed a drug assessment, anger management classes, and parenting classes. Mother did not complete her counseling or MHMR. And Mother never gave Groomer a report from Merit Family Services, which is where Mother was supposed to go for a psychosocial assessment.

Groomer said that Mother was asked to provide a urinalysis (UA) in March 2009, August 2009, and in December 2009. On March 10, 2009, Mother admitted to smoking marihuana and taking cough medicine, and Groomer did a drug swab that month. Groomer said that Mother did not take a UA on December 8, 2009, and so she confronted Mother about it; Mother said that she had forgotten, which counted as testing positive.

Mother told Groomer that she had a psychiatric evaluation done but that her second appointment was not scheduled until April 10. Groomer advised Mother to reschedule the appointment because the case would be over by then, but to Groomer's knowledge, Mother did not reschedule. Although Mother told Groomer that she had visited MHMR for a psychiatric evaluation, Groomer did not know of Mother's participating in any of MHMR's services, including medical treatment.

14

Groomer said that although Mother had completed parenting classes, Mother's parenting skills were "very lacking"; she did not know how to interact with O.E.W.-K.; and she interrogated him more than interacted with him.[8] Groomer suggested that Mother should color or read a book with O.E.W.-K., and Mother said, "[W]e don't color." The next week, Mother laid on the floor and colored a picture while O.E.W.-K. sat beside her. Additionally, Mother did not appear to know how to play with O.E.W.-K. She would stand in the hall and throw a ball as hard as she could at O.E.W.-K. while he was sitting on the couch but did not understand why Groomer had a problem with her throwing the ball at O.E.W.-K. When O.E.W.-K. told Mother that he had gotten in trouble at school or at the foster home, Mother laughed, gave Ms. Johnson a high five, and said she would have liked to have been there and seen that. When O.E.W.-K. talked about "his dog," Mother advised him that it was the dog at the foster home and gave O.E.W.-K. six dollars when he corrected himself. When O.E.W.-K. told Mother that he had a girlfriend, she said, "That's my pimp. Pimp 'em high." Moreover, Mother frequently used curse words during the visits, brought weapons to the office after being repeatedly asked not to bring them to the office, and texted and talked on the phone during the visits.

---

[8]Groomer did not think it would be appropriate for O.E.W.-K. to have therapy sessions with Mother due to the behaviors that Mother had exhibited toward him.

During this case, Mother said that she was living with her girlfriend,[9] but when Groomer called, the lady said that Mother did not live there. Groomer said that at the time of the trial, Mother was living in a motel or boarding house that was paid for by other people because Mother had no job, no home, and limited income.

Groomer said that Mother had made few positive changes. She remained defiant; she continued to bring her knife to the CPS office even after being asked not to. Mother seemed to take pleasure in seeing if people were afraid of her. She never gave direct answers. She would not do anything Groomer asked her to do until Groomer "put her between a rock and a hard place."

Groomer did not believe, based on the parts of the service plan that Mother had completed, that Mother would be able to provide a stable, nurturing home for O.E.W.-K. Groomer also did not believe that Mother could meet O.E.W.-K.'s emotional and physical needs because she had showed no indication that she could meet his needs. Ms. Johnson, not Mother, paid for whatever was brought to the office for him. Before Ms. Johnson had moved to Texas, she had set up a place in Washington for Mother and O.E.W.-K. to live, but Mother had failed to take care of O.E.W.-K., and the police found him home alone. Then, Mother bruised O.E.W.-K. once she moved to Texas with him.

---

[9]Groomer was not sure when Mother had moved out of Ms. Johnson's house.

16

Although Ms. Johnson made it abundantly clear that she did not want CPS to take her great-grandson from her,[10] Groomer did not believe Ms. Johnson could protect O.E.W.-K. from emotional and physical danger due to the interaction Groomer had witnessed between Ms. Johnson and Mother. Ms. Johnson knew that Mother had been abusive toward O.E.W.-K., but she left him in Mother's care anyway. Groomer also had concerns about Ms. Johnson's ability to parent and to provide a stable home for O.E.W.-K. based on the fact that Ms. Johnson believed that Mr. Johnson may have inappropriately touched her daughter Rosalyn, yet continued to live with Mr. Johnson, and Groomer had concerns about Ms. Johnson's age and health conditions.

Further, Mother and Ms. Johnson were often disruptive to each other, to O.E.W.-K., to the staff, to Groomer, and to others in the office during the visits, and Ms. Johnson interrogated O.E.W.-K. during the visits. Other times, they were very appropriate during the visits. Groomer testified that Ms. Johnson was also defiant, and the day before the trial, Ms. Johnson was openly defiant toward Groomer while O.E.W.-K. was present, and the security guard had to ask Ms. Johnson and Mother to leave.

_____

[10]According to the home assessment, Ms. Johnson lived beyond her means and was socially isolated. The home assessment said that the home was clean, that O.E.W.-K. had his own room, and that Ms. Johnson was purchasing the home. Ms. Johnson's home, as far as the appropriateness of the house and furnishings, was on equal footing with the foster parents' home. There were no allegations that O.E.W.-K. was malnourished while Ms. Johnson was caring for him.

Groomer believed that it was in O.E.W.-K.'s best interest to have Mother's parental rights terminated due to the physical abuse, the physical neglect, and her inability to care for his emotional, educational, and physical needs. Groomer said that Mother's drug use and criminal history also played into her recommendation that Mother's parental rights should be terminated.

Groomer said that CPS's permanency plan for O.E.W.-K. was adoption by his foster parents, who had decided to adopt him. Groomer said that O.E.W.-K.'s foster parents were "very appropriate" with him; they set boundaries, they helped him understand right and wrong choices, and they had appropriate consequences for him. They encouraged him in his music ability and provided outside activities. His foster dad took O.E.W.-K. fishing, and O.E.W.-K. was excited that he had caught the biggest fish. O.E.W.-K. had his own room at their house. They provided adequate nutrition for O.E.W.-K. The foster parents' home was very stable; both parents had college degrees and stable employment, and they were in the process of purchasing their home. Their home was a safe place for O.E.W.-K.; it was in a safe neighborhood and was extremely clean. They were very observant and knew what he was doing at all times.

### D. Visits

Mother's visits were scheduled every Tuesday from 10:00 to 11:00 a.m. Mother and Ms. Johnson came to the visits regularly, but there were some visits that Ms. Johnson did not attend. The following are summaries of several visits

18

as observed by an investigator, the two caseworkers, case aides, an intern, and the CASA volunteer.

### 1.    After the Removal on May 20, 2009

After the removal, Jaco noted that when O.E.W.-K. saw Ms. Johnson and Mother at a visit, he was really nervous and scared. Once he was in the room with them, he calmed down after a few minutes and hugged Mother, and they played and talked for some time.

### 2.    May 22, 2009

Carolyn Demmerritte, a case aide with CPS, testified that she supervised a visit with O.E.W.-K., Ms. Johnson, and Mother on May 22, 2009. O.E.W.-K. was nervous the entire visit, twiddling his hand as he sat in the rocking chair. Every five minutes, he went to Demmerrite's side, said he was ready to go, and asked her to give him a hug. Demmerritte hugged him and asked if he wanted to try to go back and spend more time with Mother and Ms. Johnson, and he went back over.

During that visit, Ms. Johnson and Mother asked O.E.W.-K. about his bruises and then asked if he remembered that he had fallen off the piano. Mother tried to get O.E.W.-K. to say that his foster father had been inappropriately touching him.

Also during the visit, Ms. Johnson told O.E.W.-K. that CPS and his foster parents were brainwashing him. Ms. Johnson also kept saying that the foster parents were telling O.E.W.-K. that he could not come home.

Mother wanted to end the visit because O.E.W.-K. kept talking about his foster parents. Although the visit was scheduled to last an hour, it lasted only half an hour.

### 3. October 6, 2009

Sandy Boatner, a CPS case aide, testified that she supervised a visit on October 6, 2009 with Mother, Ms. Johnson, and O.E.W.-K. During that visit, Mother played dodge ball with O.E.W.-K. Boatner observed that Mother threw the ball fairly hard and hit O.E.W.-K. such that he would say, "Ouch. That hurts." Also during the visit, Mother talked about "rolling her smokes." Mother used profanity several times, and Boatner interrupted the visit twice to warn her to watch her language.

### 4. October 13, 2009

Amber Thompson, who was formerly an intern in the conservatorship unit at CPS, testified that she observed a visit between O.E.W.-K. and Mother on October 13, 2009. During the visit, Mother and O.E.W.-K. talked about spelling and numbers, and O.E.W.-K. apologized for not knowing his numbers. Mother told him that the reason CPS took him into custody was because he did not know his numbers; but Mother said that it was "okay, not to worry about it [i.e., not knowing his numbers]" because she had learned patience. Mother also told O.E.W.-K. that he was "brought up halfway good."

O.E.W.-K. appeared to be scared of Mother and did not want to stay close to her. Mother asked him to stay close to her, and he did for a little while before wandering away.

During the visit, Mother read a text message out loud and said, "Get off my nuts." O.E.W.-K. moved away from her, and she said, "No, son. I wasn't talking to you. I don't speak roughly to kids any more." However, Mother used profanity twice during the visit.

### 5. October 20, 2009

During the visit on October 20, 2009, O.E.W.-K. told Mother and Ms. Johnson about upcoming Halloween festivities, and Ms. Johnson "said in a loud, authoritative voice that he should get down on his knees and ask God to forgive him because he had worshipped Satan, and when [O.E.W.-K.] hesitated, she said, I mean it, [O.E.W.-K.] Now. Get down on your knees and ask God to forgive you." Groomer interrupted the visit, put O.E.W.-K. in a room with the case aide, and told Ms. Johnson and Mother that O.E.W.-K. had done nothing for which he needed to ask forgiveness. Groomer brought O.E.W.-K. back in the room, and Ms. Johnson asked him if he was afraid of her; he held out his left hand and made a fist with his right hand and hit his left palm and said he was when she did that to him.[11] Ms. Johnson asked to speak to Groomer's supervisor, questioned Groomer's credentials, and shook her finger in Groomer's

---

[11]Groomer said that O.E.W.-K.'s statement that he was afraid of Ms. Johnson was an indication of abuse.

21

face.  When Groomer asked Ms. Johnson not to shake her finger in her face, Ms. Johnson held out her hand to Groomer's face and said, "I rebuke you, Satan."

**6.      December 8, 2009**

Boatner also supervised a visit on December 8, 2009.  When Mother arrived, she gave O.E.W.-K. a small hug.  Mother asked him to sit in her lap, but he would not; he stood in front of her wringing his hands.  During the visit, Mother kept closing her eyes and smiling a lot, which she normally did not do.  Boatner asked the caseworker to come and observe Mother's behavior, and the caseworker asked Mother to take a drug test after the visit.

**7.      December 15, 2009**

Boatner supervised a visit on December 15, 2009, at which Mother picked up O.E.W.-K., swung him around, and tried to put him on her lap, but he would not sit on her lap and ignored her.

**8.      December 29, 2009**

During the visit that Boatner supervised on December 29, 2009, Mother and Ms. Johnson both asked O.E.W.-K. where a certain necklace was, and he got very upset and started crying and wringing his hands.  O.E.W.-K. knocked on the observation window, and Boatner came out, picked him up, and held him.

**9.      January 12, 2010**

Boatner supervised a visit on January 12, 2010, during which O.E.W.-K. mentioned that he had a girlfriend, and Mother said, "That's my pimp.  Pimp 'em high.  You go, man."  Also during that visit, O.E.W.-K. ate everything in his lunch

except his sandwich. When Boatner pointed out to Mother that O.E.W.-K. needed to eat his sandwich because lunch would be over when he returned to school, Mother responded by saying, "[L]et him eat what he wants."

### 10. January 26, 2010

Boatner observed a visit on January 26, 2010, during which O.E.W.-K. would not sit next to Mother or Ms. Johnson for any length of time because he was afraid for them to check his nose and "different things." Throughout the visit, O.E.W.-K. was constantly wringing his hands. Mother noticed O.E.W.-K.'s behavior and said that he had a right to be afraid but that she did not hit anymore. During the visit, Mother sang "Penitentiary Bound" over and over and asked her son if he knew what it meant; she told him, "[D]on't worry about it, because you won't have to worry about it." Also during that visit, Mother flipped off Boatner and called another caseworker a maggot. Mother said, "[D---] it to hell," "shit," and d[---]." When Boatner interrupted the visit and told her not to say those words, O.E.W.-K. cringed, and Mother responded, "That's not cussing, . . . would you like me to really cuss?"

### 11. February 2, 2010

During the February 2, 2010 visit, Mother mentioned that O.E.W.-K.'s grandfather was coming and that they were going to the shooting range; O.E.W.-K. started backing up, exhibiting that he did not like that Mother was talking about guns.

23

## 12. February 9, 2010

Mother was ten minutes late to the visit on February 9, 2010, which was scheduled to last an hour. Forty minutes into the visit, O.E.W.-K. knocked on the window and was shaking all over; he put his arms around Boatner and wanted to go into the observation room.

## 13. March 23, 2010

During the March 23, 2010 visit, Ms. Johnson told O.E.W.-K. a story about ants. Ms. Johnson said that a little ant was removed from his family and that he was afraid. The family missed him very much. But there was a bad ant who hit and smoked weed, and O.E.W.-K. acknowledged that Mother did that. The mean ant hurt the little boy, and O.E.W.-K. said that Mother did that to him. Ms. Johnson was shaking during the visit because she is a diabetic and needed to eat, and Mother said that she was going to talk to her uncle Jamie about Ms. Johnson's not taking care of herself.

## 14. Other Visits Observed by Boatner

Boatner recalled a visit during which Mother told O.E.W.-K that she was not going to drink any more, but she subsequently went to a club on New Year's Eve. There was also a discussion about O.E.W.-K.'s consumption of alcohol, and Mother said that he needed to get his story straight: "I didn't let you drink. It was your dad." On another occasion, inappropriate music was playing on Mother's phone, and a case aide from another case went in and asked Mother to turn it off; she complied.

24

Boatner said that Ms. Johnson ate candy during the visits and that Mother told her that she needed to quit eating it because she was diabetic.

During the visits that Boatner observed, she saw some tender moments between Mother and O.E.W.-K. Boatner said that O.E.W.-K. was very stiff around Mother but that there were times when he kissed her. They also had a routine where Mother would sing a little song before they left. O.E.W.-K. kissed and hugged Ms. Johnson sometimes. Boatner did not observe a difference in O.E.W.-K.'s behavior when he was visiting with Mother as opposed to Mother and Ms. Johnson.

Boatner also observed visits between O.E.W.-K. and Jamie Johnson. Jamie came to two visits and mostly observed; one visit was by himself and was "very appropriate" in Boatner's opinion. O.E.W.-K. remembered Jamie and did not cringe or wring his hands during the visit.

### 15. Visits Observed by Letz

Letz observed quite a few of the visits and saw that Mother brought school supplies and school clothes for O.E.W.-K.

### 16. Other Visits Observed by Groomer

Ms. Johnson, at other visits, was much softer-spoken when she spoke to O.E.W.-K. She urged O.E.W.-K. to follow the rules in his foster home to earn back his toys that had been taken away, and this showed appropriate parenting. However, she laughed when he got in trouble. Ms. Johnson made snide comments about O.E.W.-K.'s haircut and made comments about his clothing

25

being inappropriate—Goodwill clothing, dirty clothing—to the point that it was obsessive. There was rarely positive reinforcement.

Ms. Johnson asked O.E.W.-K. if he had been telling people that he wanted to go home and told him that he needed to say it out loud. She told him that she had bought a new bedroom suite for him to have when he came home. Groomer did not think that conversation was appropriate because it was not a certainty that he would be going home; plus, it confused him, caused him to be more homesick, and resulted in behavior problems at school. Groomer missed only two or three visits from October through the time of trial, and during that time, O.E.W.-K. did not say that he wanted to go home until the day before trial when he was encouraged by others to talk about it.

Ms. Johnson told Groomer that she and Mother would be bringing O.E.W.-K.'s lunches to the visits, but after about three weeks, Ms. Johnson called and asked CPS to have the foster mom provide O.E.W.-K.'s lunches because it was inconvenient for Ms. Johnson to provide them. However, during Groomer's time as O.E.W.-K.'s caseworker, she saw that Mother and Ms. Johnson brought Christmas gifts, socks, and underwear.

Ms. Johnson often fell asleep during visits. Groomer saw Ms. Johnson eat four glazed donuts and drink a non-diet soda during a visit, despite her diabetes.

O.E.W.-K. was excited to see his great uncle Jamie during his visits. O.E.W.-K. told him that he knew he wanted him to come home. Groomer noted that there appeared to be a bond between O.E.W.-K. and Jamie.

26

### 17. Visits Observed by CASA Volunteer

Marla Bratton, a CASA volunteer, testified that during the twenty visits that she had observed, she saw Mother at all but one visit, Ms. Johnson at about eight or ten visits, and Jamie at two visits.[12] Bratton said that Mother's mood fluctuated and that she sometimes talked about things that were beyond O.E.W.-K.'s understanding, but Bratton could see that Mother loved O.E.W.-K. even if she was not always appropriate with him. Bratton noted that when O.E.W.-K. and Mother were alone, he shared his lunch with Mother, and sometimes he stood in front of her and moved his hands in circles like he was nervous. When Mother and Ms. Johnson were present, O.E.W.-K. wanted to hug more, sat down rather than stood, and tried to sit in Ms. Johnson's lap. Ms. Johnson was warm and friendly with O.E.W.-K., telling him stories, hugging him, and telling him that she loved him. Ms. Johnson acted as a buffer between O.E.W.-K. and Mother.

### E. Mother's Psychological Evaluation

Dr. Nichelle Wiggins, a licensed clinical psychologist, testified that she conducted a psychological evaluation on Mother on September 17, 2009. Mother called the morning of the evaluation and was very upset because she could not find the office; she was short tempered and sharp in her tone of voice toward Wiggins. An older gentleman who drove Mother to the evaluation got on

---

[12]Bratton testified that in addition to observing visits, she had visited with O.E.W.-K. in his foster home, had talked to O.E.W.-K.'s teachers, and had talked to Dr. DeYoung. O.E.W.-K.'s therapist.

the phone and eventually brought Mother to the office. Mother said that she did not know the man that had brought her to the evaluation and had just met him that morning. He sat down in the waiting room, while Dr. Wiggins dealt with Mother, who was agitated. In the process, Mother asked if she could take the man home and then come back. Dr. Wiggins asked Mother if she was comfortable with that because Dr. Wiggins had planned to ask the man to leave. Dr. Wiggins was concerned that Mother had picked up a strange man, but Mother was not concerned "in the least" because she said that she had Jesus, "And what me and Jesus can't handle, then me and my Smith & Wesson can."[13] Mother left and returned without the man thirty minutes later. Dr. Wiggins's initial impression of Mother was that she was in a manic state. Mother's moods went up and down, so Dr. Wiggins knew that she was dealing with a person who was emotionally fragile, who was hurting, who had been traumatized, and who was scared.

Mother had a very chaotic childhood. She was physically abused by Ms. Johnson and her mother and had lived with Ms. Johnson off and on throughout her life. CPS became involved when Mother's little brother died. CPS re-entered Mother's life when she was twelve because her caregivers—Ms. Johnson, her

---

[13]Mother said that her Smith & Wesson was in her car. Dr. Wiggins's recommendations stated that Mother would not comment on whether the gun was registered and that "this should be followed up. Due to her aggressive nature, a gun or any type of weapon is not advisable for [Mother] to maintain in her possession."

28

mother, and her uncle—used drugs and alcohol.  Mother said that Ms. Johnson had used crack cocaine but had been clean for about ten years.

Mother completed the tenth grade and then quit because she "had better shi[-] to do."  She said that she regretted her decision to quit school and was going to try to obtain a GED.

Mother said that she started smoking marihuana when she was twelve and would have continued to smoke if not for CPS.  Mother said that marihuana helped calm her down.  Mother did not believe that there was anything wrong with smoking marihuana.  Mother said that she had tried to limit her smoking of marihuana to outside while O.E.W.-K. was riding his bicycle, but she admitted that there were times when she had smoked it inside the house while he was in bed in the room next to hers.  She said that she did not smoke marihuana in front of him.[14]  Mother said that O.E.W.-K. knew that she smoked marihuana and that he knew that it helped her stay calm.  Mother said that O.E.W.-K. would say, "[A]t least my mommy doesn't smoke crack."  She told Dr. Wiggins that she had last used marihuana in June 2009.

Mother started using crack cocaine when she was nineteen and continued using until she was about twenty-four (when O.E.W.-K. was four).  She still had some "crack dreams" but claimed that she was no longer using.  Mother was arrested for selling crack cocaine to an undercover officer in Washington in

---

[14]Mother said that she had never blown marihuana smoke in O.E.W.-K.'s face but that she had seen someone blow marihuana smoke in a baby's face.

1999.[15] Mother said that selling crack cocaine was part of her lifestyle back then and was one of the ways that she had supported her habit. Mother said that she had left Washington and had moved to Texas so that she could get away from "that environment and the temptations." Mother said that she knew that she could not take care of O.E.W.-K. when she was using crack cocaine, so she asked Ms. Johnson to watch OE.W.K. when she was active in her crack cocaine addiction. Mother left O.E.W.-K. with Jamie for nine months while she was using crack cocaine. Mother indicated that she had not used crack cocaine for about three years.

Dr. Wiggins testified that in her opinion, Mother was experiencing crack dreams because she was missing O.E.W.-K. and wanted to get away from the pain like she had when she smoked crack cocaine. Dr. Wiggins asked Mother if she had ever gone to a Narcotics Anonymous meeting, and her answer was, "No. For what?"

Mother went to jail for trespassing in 2006 and had spent time in a residential treatment center after running away from home as a juvenile.

Mother said that she had been a member of the Hoova Crips gang. But after she gave birth to O.E.W.-K., she put aside her gang lifestyle and no longer associated with the gang.

---

[15]The trial court admitted into evidence a copy of a judgment from the State of Washington in which Mother was found guilty of the crime of conspiracy to deliver cocaine on October 3, 2000.

At the time of the evaluation, Mother said that she was living with Ms. Johnson and her grandfather who was not her biological grandfather.[16] Mother testified that Ms. Johnson had fibromyalgia, diabetes, and mixed tissue disease and was on a number of different pain medications. Mother moved from Washington to Texas to help take care of Ms. Johnson, who was not in good health, and to get away from the environment where she had been using drugs. Mother said that she has a great deal of love for Ms. Johnson, but that she prayed every week that Ms. Johnson would die because she got on her nerves and irritated her, but that she could not imagine life without her. Mother believed that Ms. Johnson was dying because of her medical issues.

Mother described Mr. Johnson as the "baby raper" and said that he raped her and her mother. Mother said that Mr. Johnson began abusing her when she was about nine years old and stopped two days shy of her sixteenth birthday after she put a knife to his private area and told him that if he wanted to keep it, he had to keep his hands off her. When Mother was nine, she told Ms. Johnson about the abuse, but Ms. Johnson did not take any action because she was on crack cocaine and Mr. Johnson was her supplier. Mother said that Mr. Johnson had admitted to abusing her mother.

---

[16]Mother said that Ms. Johnson had been married nine times.

Mother also said that the payee on her disability checks is the "baby raper."[17] Dr. Wiggins asked Mother if having Mr. Johnson as the payee on her disability checks put him in a position of control over her; Mother said that she spoke to him only once a month when she needed money and that even though he had done bad things to her, he had some redeeming qualities like teaching her to read and not taking advantage of her financially.

Mother said that her support system consisted of "God, me, myself, and I." The only people that Mother trusted 100% were herself and God.

Mother said that Jean K. is O.E.W.-K.'s father. She said that they fought with each other; they cursed at each other and slapped one another.[18]

Mother referred to her son as "Daddy" nine out of ten times. Dr. Wiggins said that it sends a "very confusing message" to a child who does not have a daddy in his life to call him that. Dr. Wiggins said that with Mother having gone through her own abuse, she could be projecting some of her own issues onto O.E.W.-K.

Mother wanted O.E.W.-K. to sleep with her when she had a bad dream and would go and get him "to make sure she could protect him." Mother said that she had limits on when O.E.W.-K. could not sleep with her, such as when she was on her menstrual cycle and when she wanted to watch television and felt

[17]Mother said that she was unemployed and had received Social Security benefits since she was five years old.

[18]Mother admitted that it did "not take much for her to curse people."

32

that the show was inappropriate for him. Mother said that O.E.W.-K. slept with her nine out of every ten nights and that once he turned eight, he would be too old to sleep with her. Dr. Wiggins testified that it could be harmful for Mother to sleep in the same bed every night with her six-year-old son because it does not teach the child boundaries.[19] Dr. Wiggins said that O.E.W.-K. might pick up Mother's fears and anxieties and start to develop an enmeshed relationship with Mother because there was no boundary of where the child started and ended and where the parent started and ended. For example, O.E.W.-K. tried to defend Mother when the monitor interrupted a visit due to Mother's behavior.[20]

Mother told Dr. Wiggins that people thought she was crazy and that was probably why she was receiving her disability check. Mother also told Dr. Wiggins that she had been diagnosed with bipolar disorder and had been prescribed Depakote at ages thirteen, fifteen, and seventeen but that she had refused to take the medication because she believed that it could poison her body. She had seen television commercials with attorneys telling people to call a phone number if they had taken certain medications that had been found to be harmful; Mother was afraid that would be the case with Depakote. Mother said

---

[19]However, Dr. Wiggins also said that it was not unusual for a five-year-old to sleep with his parents. Dr. Wiggins clarified that she was not as concerned that O.E.W.-K. was sleeping in the same bed as Mother as why he was sleeping with her—because Mother would go get him when she had a nightmare.

[20]Yet, Mother thought that O.E.W.-K. was too soft at times and needed to be toughened up with karate classes.

that if the doctors were going to put medications in her that poisoned her body, she might as well use illegal drugs.

Mother admitted that she had cut a girl in the face with a knife because "the girl kept yapping her mouth." Mother also admitted that she had thoughts of harming Ms. Johnson and Mr. Johnson. Mother had thought about putting bleach in Ms. Johnson's insulin to harm her approximately one year prior to the trial. When Mother was sixteen, she had planned to kill Ms. Johnson by lighting the house on fire because Ms. Johnson was getting on her "motherf[---]ing nerves"; Mother poured lighter fluid around the house and tried to light it, but it would not burn. Mother told Dr. Wiggins that every time she sees the "baby raper," she thinks of killing him[21] but does not act on those thoughts because she does not want to go prison and because she thinks of O.E.W.-K.

Mother admitted to having had suicidal thoughts and to having engaged in self-mutilation.[22] Mother said that she had attempted suicide by overdosing approximately ten years prior to the trial. Mother had experienced homicidal thoughts since the attempted homicide when she was sixteen, but she had not acted on them since then.[23] Mother said that she used razor blades to self-

---

[21]Mother purchased a gun the day that she arrived in Texas because she knew that she was going to be around the "baby raper."

[22]Dr. Wiggins testified that it is common for someone with a background of physical and sexual abuse to self-mutilate.

[23]But, Dr. Wiggins also testified that Mother had not had suicidal thoughts since she felt like she could keep her grandfather from hurting her.

mutilate, that she self-mutilated to relieve the stress that was inside her body, and that the last time she had engaged in that behavior was mid-August 2009. Mother told Dr. Wiggins that she did not want O.E.W.-K. to self-mutilate.

Mother told Dr. Wiggins that her gun is her "wife," that she keeps her gun in the closet, and that O.E.W.-K. saw her unloading it once. She told O.E.W.-K. that she would "break his neck" if he ever touched it. Mother also stated that she would not hurt her son and that she had realized that she had inflicted verbal abuse on O.E.W.-K.

Mother told Dr. Wiggins that she felt that one of O.E.W.-K.'s teachers did not respect her because she had asked the teacher not to touch her child, but O.E.W.-K. came home with a star drawn on his hand by the teacher. Mother said that the pentagram went against her religion, and so she went to the school and confronted the teacher in the school auditorium. Mother called the teacher several names and then choked her. Mother admitted that choking the teacher was wrong but said that she would do it again "[i]n a hot second, a New York minute" if the teacher touched O.E.W.-K. again. Mother admitted that she smothered O.E.W.-K. and was overly protective of him to the point where she did not want people to touch him, to help wipe his nose, or to hug him unless they first received her consent. Mother said that she was "strange about [her] child," that she feared that somebody would hurt him, that she was afraid of what her reaction would be, and that she would "catch a case" if someone touched him

inappropriately.[24] Dr. Wiggins was concerned that Mother was so overprotective that she became violent at the slightest thing regarding O.E.W.-K. Dr. Wiggins gave Mother some alternatives for handling a situation in which a teacher might put a sticker on O.E.W.-K., but Dr. Wiggins said that Mother had her own ideas of what she needed to do to protect her child and that in the moment, she would act based on what she believed and thought was correct.

Mother said that CPS was involved in her life as a result of false allegations that she had physically abused O.E.W.-K. Mother admitted that she had spanked him with a belt because he had been watching television instead of practicing his numbers. Mother said that she left marks on his legs, that they were noticed at school, and that CPS was contacted.

Mother was very concerned that O.E.W.-K. was not being well taken care of in foster care and admitted that she had used profanity in front of O.E.W.-K. at a visit after a monitor came in and told her not to question O.E.W.-K. about his clothing. Mother told the monitor, "You maggot-mouthed b[----]." Mother used profanity throughout the day and told O.E.W.-K. that his clothes looked "like shit." Dr. Wiggins was not sure if O.E.W.-K. was reacting to the language or more to the fact that he felt Mother was being attacked; he responded, "Look. That's my momma. She can say what she wants to say to me."

---

[24]Dr. Wiggins said that it is not unusual for a parent who has had a chaotic childhood to want to protect her own child from having a chaotic childhood.

36

Dr. Wiggins conducted personality testing on Mother and, based on the results of that testing, had concerns about Mother's mental health and personality traits. Dr. Wiggins said that what stood out most was that Mother had experienced chronic mental health issues since she was a teenager and had not been willing to take the necessary steps to bring stability to her emotional functioning. Dr. Wiggins testified that Mother was "very illogical, irrational, and really did not understand the impact of her decision and behaviors on other people." Dr. Wiggins said that Mother had major frustration issues and could become very aggressive, so it was important to have very strong boundaries with her. Dr. Wiggins also testified that Mother had exhibited violent mood swings, had engaged in self-mutilation, and had abused drugs, which Dr. Wiggins equated to "a chronic pattern of mental instability." Dr. Wiggins believed that Mother needed treatment for her bipolar disorder and for post-traumatic stress disorder. Dr. Wiggins stated that the chances of Mother's relapsing into drug use was high if she did not receive treatment for her mental health issues and that relapse chances remained high regardless because Mother had been abusing substances for a large part of her life.

Dr. Wiggins recommended to CPS that Mother obtain a psychiatric consultation for medication. Dr. Wiggins believed that there was a possibility that Mother's mood swings and emotions could be controlled by medication and that she would benefit from participating in MHMR and individual counseling, anger management, outpatient drug treatment program, Narcotics Anonymous, random

37

drug testing, parenting classes, and family counseling with her son and by obtaining her GED. Dr. Wiggins was concerned that Mother had expressed a strong unwillingness to even consider, much less act upon, the recommendations that were made.[25] Mother was willing to talk about things in counseling as long as it was on her terms because she had a strong need for control, which was not unusual for someone who had been abused.

Mother told Dr. Wiggins that she was abused by her mother and Ms. Johnson, and Mother's responses indicated that she knew the difference between a spanking and abuse. Mother had already started taking parenting classes when she met with Dr. Wiggins and said that she no longer saw a need to spank O.E.W.-K. because she had learned other ways of effectively intervening. However, Dr. Wiggins testified that Mother did not have effective parenting tools in place to take care of O.E.W.-K. emotionally, physically, and financially. Mother told Dr. Wiggins that she depended heavily on her grandparents because everything that she and O.E.W.-K. needed was "right there." Mother seemed conflicted because she needed her grandparents, but she did not want to need them. Emotionally, Mother was not in a place to be able to make good decisions for herself or O.E.W.-K. Dr. Wiggins was concerned that Mother was using O.E.W.-K. as a comfort, that he was her reason for living, and that she was losing herself in him, which was not effective

---

[25]Mother was very argumentative; her first response was to say, "No."

38

parenting. Dr. Wiggins said this could create issues in a parent-child relationship.

With regard to whether Mother could be an active participant in O.E.W.-K.'s life, Dr. Wiggins said that she could if certain conditions were met. Dr. Wiggins testified that she had "put those recommendations in there" to help Mother establish stability and the ability to parent effectively while unsupervised. Dr. Wiggins said that if Mother was not able to meet "those conditions," then she would be very concerned. Dr. Wiggins said that Mother could participate in O.E.W.-K.'s life with supervision if someone set boundaries with her. Dr. Wiggins admitted that she knew when she wrote her recommendations that the prognosis was poor that Mother would follow through completely because people like Mother "don't see people as trying to help them." When asked whether she thought someone who did everything that CPS asked and then CPS still went forward with suit to terminate her parental rights would be distrustful of the system, Dr. Wiggins said that it is a judgment call, but she recommended looking at whether the person was demonstrating emotional stability, good decision-making, the ability to live independently, and the ability to participate in services on her own.

It concerned Dr. Wiggins that a request had been made for O.E.W.-K. to go back and live in the house with Mother and his grandparents because Mother believed she needed to have her gun and her knife to be able to protect her son and because there was a sexual abuse perpetrator in the home. Dr. Wiggins

39

said that Ms. Johnson had failed to protect Mother in this setting. Dr. Wiggins was also concerned about what would happen if CPS was out of the picture because the threat of a urinalysis was the only thing keeping Mother from using marihuana.[26] Dr. Wiggins opined that it would be too difficult for Mother to maintain stability in an environment where she had to constantly see the man whom she calls the "baby raper" and Ms. Johnson, whom she loved but at times wished was dead. Dr. Wiggins described the environment as "a constant state of conflict and tension and problems." Dr. Wiggins had a great deal of concern about a child being in an environment that was as closed off from the outside and as dysfunctional as Mother had described.

Dr. Wiggins said that her interaction with Mother on the day of trial was much like how Mother had presented on the day of the evaluation: she was crying one minute, angry the next, and then gave Dr. Wiggins a hug. Mother made a couple of inappropriate comments to people in the courtroom and acted socially deficient with her comments.

### F. O.E.W.-K.'s Therapy

Dr. Mark DeYoung, a licensed marriage and family therapist, testified that as of the time of the trial, he had conducted thirty-five therapy sessions with O.E.W.-K. O.E.W.-K. met with Dr. DeYoung weekly for forty-five minutes to an hour. Dr. DeYoung also worked with the foster family to help with O.E.W.-K.'s

---

[26]Mother had said that on a scale from one to ten, the level that she missed marihuana was a twelve.

40

behavior at school and at home. Dr. DeYoung testified that he was not asked by TDFPS to work with the biological family.

Early on during the therapy sessions, O.E.W.-K. mentioned that Mr. Johnson had hurt Mother and Ms. Johnson, but O.E.W.-K. did not elaborate on this.

Dr. DeYoung understood that O.E.W.-K. had lived with Mother's uncle Jamie in Seattle for two and a half years. O.E.W.-K. did not indicate anything negative in his relationship with Jamie; O.E.W.-K. was positive in discussing his great uncle.

On numerous occasions, O.E.W.-K. mentioned that Mother and Ms. Johnson had yelled and screamed at each other, both when he was at home and during the visits. Dr. DeYoung said that he was not sure whether Ms. Johnson would be able to manage situations involving Mother because she had been present at the home when Mother mistreated O.E.W.-K. and was present at the visits when yelling and screaming had occurred. Additionally, Dr. DeYoung said that it can be bad for a child to be in a household where adults argue and raise their voices.

O.E.W.-K. told Dr. DeYoung about an incident in which he struggled with his math homework, and Mother spanked him with a belt. However, O.E.W.-K. said that Mother told him to misbehave in the classroom and to disobey his teachers.

41

During several of the therapy sessions, O.E.W.-K. shared that Mother had talked to him about having a gun and about the fact that she would not hesitate to use it to threaten others; O.E.W.-K. said that was very frightening to him. O.E.W.-K. also talked about Mother's showing him a gun and asking him to touch it and hold it and said that was also very frightening to him. O.E.W.-K. told Dr. DeYoung that Mother carried weapons on her at all times.

On November 4, 2009, O.E.W.-K. told Dr. DeYoung that Ms. Johnson told him that he would be coming home soon and that he was not to tell anyone. Around the time of the December 3, 2009 session, Mother took O.E.W.-K. to the bathroom and told him this again. Around the time of the January 6, 2010 session, O.E.W.-K. told Dr. DeYoung that he had lived with an uncle (his great uncle Jamie) in Seattle and also that Ms. Johnson told him that he was moving to Seattle to live with his great uncle. O.E.W.-K. said that when Mother and Ms. Johnson told him where he was going to live, it made him feel like he had jellybeans in his brain and that he felt all jumbled up. Dr. DeYoung sensed that O.E.W.-K. was confused. Dr. DeYoung thought that Mother's and Ms. Johnson's remarks contributed to O.E.W.-K.'s overall sense of uncertainty.

During the February 10, 2010 therapy session, O.E.W.-K. drew a picture of his biological family and said that in the picture, Mother and Ms. Johnson were screaming and yelling at each other. Also during that session, O.E.W.-K. drew a picture of his foster family at a restaurant, and he talked about the fun that they had while they were there.

42

During the March 10, 2010 therapy session, O.E.W.-K. said that Mother had smoked a pipe and had blown smoke into his nostrils.

Dr. DeYoung saw O.E.W.-K. after visits with Mother and Ms. Johnson, and he was nervous and anxious, his speech was difficult, he had a hard time expressing himself, and he visibly shook when he discussed the visits.

Dr. DeYoung's primary concern was that all children need a safe place to be, and O.E.W.-K. "doesn't seem to feel as if being with his mother or his [great-] grandmother feels safe to him, because he feels nervous when they argue or fight. He's afraid of what might happen. He's afraid of being hit again, which is a phrase he's used." Dr. DeYoung did not believe that O.E.W.-K. would benefit by having family therapy with his biological family because, in Dr. DeYoung's opinion, O.E.W.-K. was traumatized by the simplest of visits at the CPS office. Dr. DeYoung testified that family therapy sessions have the potential to be contentious and are more complex than a visit at the CPS office; because the family was struggling to manage in the CPS office, his concern was that they would struggle more with managing a family therapy session.

Although Dr. DeYoung testified that O.E.W.-K. could articulate the distinction between what was truth and what was not and could tell stories and events in a consistent manner, Dr. DeYoung said that it would be emotionally traumatic for six-year-old O.E.W.-K. to testify in front of his family about his feelings.

43

### G. Family Testimony at Trial

#### 1. Ms. Johnson's Testimony

Ms. Johnson testified that she had been married three times. She admitted that she had used cocaine when she was younger but that she was sixty-four years old at the time of trial and did not use drugs nor think about them. She said that she had no idea when she had last used cocaine; she said that Mother had said it had been seventeen years and that others had said that it had been ten years. She said that she remembered writing a letter on July 10, 2009 to the court, the lawyers, Channel Four News, and Dr. Phil, but she did not recall that she had stated in the letter that she had used drugs in 1994. She said that she had talked to O.E.W.-K., and he knew that drugs were bad.[27] She denied that Mr. Johnson had supplied her with crack cocaine.

Ms. Johnson said that Mother had told her that Mr. Johnson did something inappropriate to her and then that he did not. Ms. Johnson said that Mother had done the same thing regarding a young man that had lived in their neighborhood when they lived in California. Ms. Johnson took the young man to court, he spent time in jail, and then Mother said that he did not molest her. Thus, Ms. Johnson did not believe that Mother's allegations about Mr. Johnson were true.[28]

---

[27]Ms. Johnson said that she never told O.E.W.-K. about marihuana, unless Mother had it, and then she told him that it was not a good thing.

[28]Jamie also testified that he did not believe Mother's story that Mr. Johnson had sexually assaulted her.

Ms. Johnson said that Mother "has her issues," which Ms. Johnson explained as Mother's tendency to teach O.E.W.-K. "nonsense stuff." Ms. Johnson said that Mother listened to inappropriate music and that O.E.W.-K. learned the lyrics, that she did not dress O.E.W.-K. appropriately, and that she forgot to buy diapers when he was an infant. Because Ms. Johnson loved O.E.W.-K. with all of her heart and wanted to protect him from mental and physical abuse, she kept O.E.W.-K. with her while she lived in Washington. Mother did what she wanted to do, and if she wanted to see O.E.W.-K., she came by Ms. Johnson's house to visit him.

Before Ms. Johnson left Seattle to move to Texas, she set up Mother with an apartment and gave "her every single thing that she would need to be a mother." Ms. Johnson knew that Mother would not be able to take proper care of O.E.W.-K., but Ms. Johnson still left him with Mother, hoping that she would do the right thing. Because Mother had custody of O.E.W.-K., Ms. Johnson could not bring him to Texas. Plus, Ms. Johnson rationalized that Jamie was still in Washington and that she could call him to check on Mother and O.E.W.-K. In late June 2006, the police in Washington called Ms. Johnson in Texas and asked whether there was anyone in Seattle who could take care of O.E.W.-K., and Ms. Johnson told them Jamie was there. Ms. Johnson learned that law enforcement had found two-year-old O.E.W.-K. alone in the home that she had set up for him and Mother. Although Ms. Johnson had never seen Mother use crack cocaine, Ms. Johnson believed that Mother was using crack cocaine in June 2006.

45

Ms. Johnson did not believe that Mother should hit people. Ms. Johnson said that Mother could have involved her in the situation at the school and that she would have assisted Mother with talking to the teachers in an appropriate manner. Ms. Johnson believed that Mother would obey her; even though she might "start talking crazy," she still did what Ms. Johnson asked of her.

Ms. Johnson said that the visits took place every other Tuesday and that she insisted on seeing O.E.W.-K. because he is her heart. Ms. Johnson said that O.E.W.-K. was able to communicate his thoughts to her and that she then directed him in the way that he should go. Ms. Johnson said that during one of the visits, they did not have much to do because Mother had walked out. Ms. Johnson asked O.E.W.-K. what he wanted to do, and he requested to hear a story about ants. Ms. Johnson told O.E.W.-K. a story about a little ant, and the moral of the story was that he needed to learn forgiveness so that he could forgive Mother.

During the visit on December 22, 2009, O.E.W.-K. told everyone that he wanted to come home. Ms. Johnson told him that he needed to tell his foster parents that. Ms. Johnson said that during her visit with O.E.W.-K. the day before the trial, he told Mother that he was going home and would be living with Ms. Johnson. Ms. Johnson said that O.E.W.-K. told her and his guardian ad litem that he wanted to go home, and Ms. Johnson told him to pray. Ms. Johnson said that she had seen CPS lie and that she had seen them stop O.E.W.-K. from saying that he wanted to go home.

46

At the time of trial, Mother was living in a motel, and Ms. Johnson was assisting her with her incidental expenses, which totaled fifty or sixty dollars a month. Ms. Johnson said that Mr. Johnson's money pays for Mother's motel room.[29]

Ms. Johnson said that she gave Mother an opportunity to take care of O.E.W.-K. on her own and that Mother promised that she would care for O.E.W.-K., but did not. In Ms. Johnson's opinion, Mother "is not a suitable parent, and she's done all the things that I've seen, including that picture [showing a bruise on O.E.W.-K.'s face] . . . . [I]t broke my heart, because [O.E.W.-K.] doesn't need to be hit."[30] Ms. Johnson said that she would no longer allow Mother and O.E.W.-K. to live with her at the same time, that she had to choose between them, and that she chose O.E.W.-K. Ms. Johnson believed that O.E.W.-K. should be with her and Jamie.[31]

---

[29]Ms. Johnson testified that Mother received approximately $650 per month in disability.

[30]Prior to that statement, Ms. Johnson had testified that she had not seen bruises on O.E.W.-K. from Mother and that she had never seen Mother hit O.E.W.-K. on the head.

[31]Ms. Johnson admitted that to control her medical conditions, she took ten pills a day, including propranolol, hydrochlorothiazide, glucophage, insulin, and medicine to quit smoking. However, Ms. Johnson believed that she could take better care of O.E.W.-K. now that she was in Texas because her osteoarthritis had improved from being in the warmer climate.

## 2.    Jamie's Testimony

Jamie Johnson, Mother's uncle, testified that he had raised O.E.W.-K. from the time he was about two years old until he was about five and a half. Jamie did not see Mother using drugs during that time but said that Mother was "going through some issues" and was unable to care for O.E.W.-K. emotionally and financially. Jamie potty-trained O.E.W.-K. and enrolled him in private school, and he did well in school while he lived with Jamie. Jamie said that no referrals were made when O.E.W.-K. lived with him in Washington. During that time, Jamie developed a significant bond with O.E.W.-K.

Jamie let Mother move O.E.W.-K. from Washington to Texas because she was coming to live with Ms. Johnson and because he thought she would be able to help Mother with O.E.W.-K. Jamie testified that he had realized that he should have kept O.E.W.-K. himself.

Jamie said that he had moved to Texas to help Ms. Johnson and to help with O.E.W.-K.'s situation. At the time of trial, he was living with Ms. Johnson. He said that O.E.W.-K. had his own room at Ms. Johnson's house before he was removed and that even with Jamie, his wife, and his child, there was still plenty of room for O.E.W.-K. Jamie agreed with the home assessment's statement that the family had demonstrated its ability to meet all of O.E.W.-K.'s financial needs.

Jamie admitted that he had a past criminal record but said that none of the charges were drug related. Jamie was convicted in 2000 in Washington for the misdemeanor of domestic violence. Jamie said that he pleaded no contest to the

48

charge, but he said that he merely took his old girlfriend's car. Jamie was convicted of two counts of felony burglary of a habitation for going into the house of his mother's previous boyfriend or fiancé. He was charged with driving without a license in 2001. Jamie was not aware whether his wife had been convicted of the misdemeanor of drug paraphernalia in March 2008 or whether she had been found guilty of a Class C felony in 2005 for controlled substance manufacturing, delivery, or possession. When asked whether his wife had any problems with drug use, he said that he did not know of any.

Jamie testified that if O.E.W.-K. was placed back in Ms. Johnson's home where Jamie lived, he would use all of his financial abilities to help support O.E.W.-K. and would also protect him in any way possible, including protecting him from Mother.

### 3. Mother's Testimony

Mother was incarcerated only once and that was when she was eighteen. Mother explained that her two convictions that contained the initials "VUCSA" stood for "Violation of the Uniform Controlled Substance Act." One of the convictions was for cocaine, and the other one was "VUCSA Burn." Mother said that she was not sure what "Burn" stood for but that it could mean that the drugs were tested and did not contain enough to test. Mother was found guilty of that charge.

Mother did not remember the last time that she had used crack cocaine; she had not used it since she moved to Texas. Mother no longer smoked

49

marihuana. She admitted that she used to smoke marihuana but said that O.E.W.-K. never saw her smoke marihuana and that she never blew smoke in his mouth or nose. When Mother was asked whether she had ever seen anyone blow smoke in O.E.W.-K.'s mouth or nose, she said, "I haven't seen anybody get that close to my child without having to deal with me." Mother said that Dr. Wiggins's report was not accurate if it stated that she told her that she used to get high in her room at Ms. Johnson's house. Mother said that the only thing she has done in her room is drink beer and that she is twenty-eight years old, which is old enough to drink. Mother also said that she did not smoke a marihuana cigarette while O.E.W.-K. was in the car parked outside the school. Mother said,

> First off, when I did smoke marihuana, I never roll[ed] joints. That's point number one. I roll my own cigarettes, and they're special blend, so that's probably the smell he [the physical education aide] smelled. Second of all, I'm not allowed to smoke marihuana in my grandmother's car, I wouldn't have the keys right now. I don't do drugs in my grandmother's car.

Mother stopped socializing with her gang associates when she became a mother.

Mother said that she left O.E.W.-K. alone when he was two and a half years old and went next door to her girlfriend's house. Mother said that she now knows that was not appropriate. Mother said that she was not using crack or ecstasy during those days but that she was smoking marihuana. Mother said that she gave O.E.W.-K. to her uncle (Jamie) because she knew that she was not being the best parent that she could be. Mother said that it is not true that

50

Jamie had O.E.W.-K. for two and a half years. Mother said that O.E.W.-K. lived with her until he was three; that she and Ms. Johnson paid for his fourth birthday, which he celebrated with Jamie; and that by age five, he was back with her because she and Ms. Johnson paid for his fifth and sixth birthday parties.

Mother testified that O.E.W.-K. was removed from her care on May 20, 2009, because she had spanked him with a belt. Since then, Mother had learned in her parenting class that all physical contact with a child is inappropriate. Mother said that she had learned that she could take a child's toys, put a six-year-old child in a six-minute timeout, explain why the child was being put there, and "then you go on from there." Mother said that she would never again spank O.E.W.-K. with a belt and that she regretted spanking O.E.W.-K. with a belt, now that she knows that it is wrong.

Mother agreed that the June 16, 2009 service plan that she had signed required her to take a psychological evaluation and a psychosocial assessment, to participate in individual counseling[32] and parenting classes, to pass the psychiatric evaluation, to complete random drug testing, to refrain from physical discipline, to refrain from bringing any type of weapons to the CPS office, to maintain safe and stable housing, and to complete a drug assessment. Mother said that she had completed a psychosocial assessment, a psychological

---

[32]Mother said that she was never offered family counseling with O.E.W.-K. even though she brought it up with Letz.

evaluation, parenting classes, and anger management, as well as ten of twelve individual counseling sessions.[33]  Mother also said that she took five drug tests.

Mother agreed that in a very short time frame she can go from being angry to being sad to being happy; Mother said that it depends on how she is provoked. Mother said that at her MHMR appointment, she had been diagnosed as bipolar and was prescribed medication but had not taken it.  Mother said that she could understand why her not taking medication might cause "you people" concern. Mother said that she had a follow-up appointment coming up with MHMR on April 10, 2010 (after the trial).  Mother said that her initial appointment was in November and that they scheduled her follow-up for a Tuesday, so she had to reschedule because that was the day that she visited O.E.W.-K.  Mother said that she would still go to the appointment even if the court decided to terminate her parental rights and that if MHMR recommended medication, she would give it a try.  However, Mother said that she feared medication because over the years, she had put enough poison in her body "to get everybody in this [court]room high" and feared that medication would continue to poison her body.

Mother said that she could not remember when she had last self-mutilated, but the last time she had thought about doing it was when Letz was her case

---

[33]Mother said that she had completed her psychological evaluation on September 24, 2009, and had completed the rest of her service plan tasks prior to September 21, 2009.  Mother said that she started working her service plan as soon as she received it in June 2009 and that she did not complete the psychiatric evaluation until November because that is the date that she was given when she called to schedule it in June.

worker. Mother said that it had been ten years, if not longer, since she had attempted suicide.

With regard to the assault on O.E.W.-K.'s teacher, Mother said that the teacher refused to press charges. On the first day of school, Mother and Ms. Johnson told O.E.W.-K.'s teacher "how apprehensive and protective and somewhat smothering" Mother was about O.E.W.-K. and that she did not want the teacher to touch him. Mother told the teacher, "[Y]our job is to teach him his ABC's and 1-2-3's, and the way I give him to you is please, that's how I want him back."[34] Mother said that the teacher nodded that she understood. One day the teacher put a star on O.E.W.-K.'s hand, and Mother said that it was against her religion to put anything on the hand or forehead. Mother admitted that she choked O.E.W.-K.'s teacher and that it was "wrong to put your hands on people."

Mother said that Mr. Johnson is the payee for her Social Security disability checks because that was the way Ms. Johnson set it up when Mother was a child. Mother received $664 per month in disability benefits.

When Mother lived with Ms. Johnson, she paid $300 per month for rent, utilities, and cable. Mother did some non-excruciating chores like emptying the dishwasher, vacuuming the floor, and occasionally O.E.W.-K.'s laundry. Mother testified that as of the time of trial, she was not living with Ms. Johnson. When Mother was asked about her tendency to move back in with Ms. Johnson after

---

[34]Mother said that she had helped O.E.W.-K. with his homework and that he had received a "plus" or an "excellent" in all his classes.

having moved out, Mother said, "Oh, I'm going home," indicating that she would move back in with Ms. Johnson at some point in the future.

Mother said that it was not necessarily true that O.E.W.-K. was traumatized by her visits at CPS. Mother said that she had never told O.E.W.-K. that his father was worthless or "a piece of shit," but she had called him a "sorry-ass" in front of O.E.W.-K. Mother knew that others probably thought that was not appropriate to tell O.E.W.-K. that, but she said that she would never lie to O.E.W.-K. if he asked her about his father.

Mother said that she could see why there were concerns about her parenting O.E.W.-K. She said that there were problems before and that she was sure that there would be problems in the future because there were always problems but that she loved O.E.W.-K. more than she ever thought she could and that she had left her home so that he could come home.

## H.    Recommendations

Letz, the first caseworker, did not feel that returning O.E.W.-K. to his home would have been safe for him.

Bratton, the CASA volunteer, testified that she knew that the family loved O.E.W.-K. very much, but she was concerned about his safety and was not sure that they would be able to protect him.

Groomer believed that it was in O.E.W.-K.'s best interest to have Mother's parental rights terminated.

Ms. Johnson believed that O.E.W.-K. should be with her and Jamie.

54

Mother believed that it was not in O.E.W.-K.'s best interest to be placed outside of their family because they would teach him his identity and values. Mother therefore wanted O.E.W.-K. to live with Ms. Johnson if the trial court terminated Mother's parental rights.

## I. Trial Court's Disposition

After hearing the above evidence, the trial court signed a judgment terminating Mother's parental rights to O.E.W.-K. The trial court found by clear and convincing evidence that Mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; that Mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; and that termination of the parent-child relationship with Mother was in the child's best interest. This appeal followed.

## III. LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE OF CONDUCT AND ENVIRONMENTAL ENDANGERMENT TO SUPPORT TERMINATION ORDER

In her first through fourth issues, Mother argues that there is legally and factually insufficient evidence to establish the termination grounds under section 161.001(1)(D) and (E).[35] Specifically, Mother argues that there was insufficient

---

[35]In her briefing challenging the legal and factual sufficiency of the evidence to support the trial court's (D) and (E) endangerment findings, Mother also argues that the trial court erroneously admitted testimony from Hill—that O.E.W.-K. told Hill that Mother had made the bruise on him—without making the proper prerequisite findings and that the trial court erroneously admitted testimony from Hill (although such testimony actually came from Dr. DeYoung)

evidence to establish physical abuse, that Mother worked her service plan, and that she reformed her life out of love for her son.

## A. Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the

regarding O.E.W.-K.'s seeing weapons in his home. Because Mother did not raise these "issues" in her statement of points, we are prohibited from addressing them in this appeal. *See In re J.H.G.*, 302 S.W.3d 304, 306 (Tex. 2010); *In re K.B.*, No. 02-09-00441-CV, 2010 WL 4028107, at *15 (Tex. App.—Fort Worth Oct. 14, 2010, no pet.) (mem. op.); *see also Cravens v. City of Amarillo*, 309 S.W.2d 903, 906–07 (Tex. Civ. App.—Amarillo, writ dism'd) (overruling complaints and charges that were not presented in a separate point of error and that were also not supported by the record), *cert. denied*, 358 U.S. 882 (1958).

parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2010); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were

proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated section 161.001(1)(D) or (E) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.,* 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm

58

belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Law on Endangerment

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), TDFPS had to prove that Mother knowingly placed or allowed O.E.W.-K. to remain in conditions or surroundings that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re J.A.J.*, 225 S.W.3d 621, 625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh'g), *judgm't aff'd in part, rev'd in part by* 243 S.W.3d 611 (Tex. 2007). It focuses on the suitability of the child's living conditions. *J.A.J.*, 225 S.W.3d at 624. Thus, under (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. *Id*.

Under (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of Mother's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not

59

necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 126; *see In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (mental conditions and suicide attempts of parent were factors in considering whether parent engaged in conduct that endangered emotional well-being of child). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

## C. Evidence Is Legally and Factually Sufficient to Support Termination Order

In determining whether the evidence is legally and factually sufficient to support termination of Mother's parental rights pursuant to (D) or (E), we look at whether Mother (1) knowingly placed or knowingly allowed O.E.W.-K. to remain

in conditions or surroundings that endangered his physical or emotional well-being or (2) engaged in conduct or knowingly placed O.E.W.-K. with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). The Department's brief contains a combined legal and factual sufficiency analysis focusing on five acts or omissions by Mother that it contends support termination of Mother's rights under (D) and (E): that Mother's physical violence against O.E.W.-K. was endangering; that the violent environment created by Mother was endangering to O.E.W.-K.; that Mother's drug use was endangering; that Mother endangered O.E.W.-K. by her refusal to accept treatment for her mental illnesses; and that Mother endangered O.E.W.-K. by exposing him to Mr. Johnson and Ms. Johnson. We will examine all of the evidence in the record, focusing on these allegations.

Jaco witnessed Mother slap O.E.W.-K. on the head after he asked her to get something out of the refrigerator; the slap was enough to make O.E.W.-K. whimper a little. Jaco also saw bruises on O.E.W.-K.'s face, right arm, hands, and his right leg, which Mother admitted causing by striking O.E.W.-K. with a belt. Approximately two weeks later, Jaco received a call from Ms. Johnson that Mother had become upset when O.E.W.-K. claimed to be sick, so Mother had grabbed him and pulled him. Ms. Johnson was fearful that Mother was "really going to hurt him." Jaco heard Mother yelling in the background: "No one is going to tell me I can't hit my son. If I want to beat him, I'll beat him, and there is nothing you can do about it." Ms. Johnson later tried to say that O.E.W.-K. had

61

caused all of the bruises on his body; Ms. Johnson said that she would tell that story to get O.E.W.-K. back. But at trial, Ms. Johnson testified that Mother caused the bruises that she had seen in a picture of O.E.W.-K. During one of the visits after O.E.W.-K. was removed from Mother's care, Mother stood in the hall and threw a ball as hard as she could at O.E.W.-K. while he was sitting on the couch. Thus, evidence exists supporting an inference that Mother committed physical violence against O.E.W.-K. on multiple occasions and that her conduct physically endangered O.E.W.-K. *Cf. In re J.C.*, 151 S.W.3d 284, 288 (Tex. App.—Texarkana 2004, no pet.) (stating that father was indicted for injury to a child after beating child with a belt and leaving bruises on child from his head to his toes).

Moreover, the record reflects that while Mother and O.E.W.-K. lived with Ms. Johnson and Mr. Johnson, Mother and Ms. Johnson screamed at each other, and O.E.W.-K. drew a picture of this while he was in therapy. Mother hit Ms. Johnson in the shoulder after she had undergone shoulder surgery. Mother and O.E.W.-K.'s father had engaged in domestic violence. Mother threatened and assaulted O.E.W.-K.'s teacher and carried weapons to his school. Mother had shown her gun to O.E.W.-K., made him hold it, and later told him that she would "break his neck" if he touched it. Mother also admitted that it did not take much for her to curse and that she cursed frequently. This evidence is some evidence that Mother's conduct directed at others, both within the family and outside the family, created an environment that endangered O.E.W.-K.'s

62

emotional or physical well-being. *See In re C.J.*, Nos. 14-07-00838-CV, 14-07-00839-CV, 2008 WL 4447687, at *4 (Tex. App.—Houston [14th Dist.] July 10, 2008, no pet.) (mem. op.) (holding that sufficient evidence existed to support endangering conduct finding based on appellant's history of domestic violence, verbal altercations and threats, and physically aggressive behavior that required her to be supervised at all times while in the presence of children).

Mother also had a long history of drug use and had two drug-related charges on her record. Mother told several people that she had used drugs while she was pregnant with O.E.W.-K. Mother's drug addiction required her to have others watch her son or to leave him alone. A physical education aide observed Mother smoking marihuana in her car while O.E.W.-K. was with her. The record contains other evidence that Mother smoked marihuana in her room, which was next door to O.E.W.-K.'s room, although Mother denied this. Mother tested positive for drugs while she was working her plan and admitted to using in July 2009. O.E.W.-K. knew that Mother smoked marihuana and took up for her, stating that he was glad that she did not smoke crack. Mother did not believe that marihuana was bad for her and intimated that she would still be using if she was not working her CPS service plan because on a scale of one to ten, she missed marihuana a twelve. This is some evidence that Mother's conduct created an environment that endangered O.E.W.-K.'s emotional or physical well-being. *See In re J.M.*, No. 02-08-00259-CV, 2009 WL 112679, at *4–5 (Tex. App.—Fort Worth Jan. 15, 2009, no pet.) (mem. op.) (holding that mother's drug

63

use during pregnancy and drug use six to eight months before the termination trial constituted evidence of endangerment under section 161.001(1)(E)).

Additionally, Mother was diagnosed with bipolar disorder as a teenager and was prescribed Depakote, but she refused to take any medication for her mental illness because she feared the medication would poison her. During her service plan, Mother's bipolar disorder diagnosis was confirmed, along with oppositional/defiant disorder, ADHD, and multiple personality disorder, but she still was not taking medication at the time of trial. Her mental illness caused her to experience violent mood fluctuations, and she admitted having thoughts of suicide and engaging in self-mutilation. Mother said that she often considered killing Ms. Johnson and Mr. Johnson. This is some evidence that Mother's conduct created an environment that endangered O.E.W.-K.'s emotional or physical well-being. *See Sawyer v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00286-CV, 2003 WL 549216, at *8 (Tex. App.—Austin Feb. 27, 2003, no pet.) (mem. op.) (stating that fact that appellant had refused treatment for her mental illness endangered her children).

Furthermore, Mother testified that she had been sexually assaulted for numerous years by Mr. Johnson and referred to him as the "baby raper." After Mother told Ms. Johnson about the sexual abuse, Ms. Johnson did nothing because she believed Mr. Johnson when he said that he had not touched Mother, even though he had admitted to molesting Mother's mother. Yet, Mother had moved to Texas and had brought O.E.W.-K. with her to live in a home with

Mr. Johnson and Ms. Johnson. Ms. Johnson had numerous health conditions but was forced to care for O.E.W.-K. most of the time because of Mother's drug use and laziness. Mother's living situation fluctuated, and she admitted that she could not go for very long without living with Ms. Johnson. Mother and Ms. Johnson told O.E.W.-K. that he would be coming home to live in the Johnson household, and it caused him stress. O.E.W.-K. was afraid of Ms. Johnson because she had previously hit him. This is some evidence that Mother exposed O.E.W.-K. to an environment that endangered O.E.W.-K.'s physical or emotional well-being. *Cf. In re C.L.C.*, 119 S.W.3d 382, 393 (Tex. App.—Tyler 2003, no pet.) (stating that "it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child . . . are not inherently a part of the 'conditions and surroundings' of that place or home" and that this statute—section 161.001(1)(D)—is designed to protect a child from "precisely such an environment").

Viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that some evidence exists that will support a factfinder's firm conviction or belief that Mother violated subsections (D) and (E). We thus hold that the evidence is legally sufficient to support termination of Mother's parental rights to O.E.W.-K. under subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *Jordan v. Dossey*, 325 S.W.3d 700, 721–26 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding that evidence was legally

sufficient to support termination under (D) and (E) because mother allowed child to remain in the care of a person known to be violent, abusive, and a convicted sex offender; endangered child as a fetus; lived an unstable, transient lifestyle; and was currently diagnosed with bipolar and other disorders and was not taking her medication); *R.W.*, 129 S.W.3d at 739–44 (holding that evidence was legally sufficient to support termination under (E) because father had a history of substance abuse, mental instability, and criminal history); *Sawyer*, 2003 WL 549216, at *9 (holding that evidence was legally sufficient to support termination under (D) and (E) because mother had a history of mental illness, housing and financial instability, relationships with violent men, and drug use).  We overrule Mother's first and third issues.

Viewing all of the evidence in a neutral light, the volume of evidence—set forth extensively above—that a reasonable factfinder could have credited in favor of subsections (D) and (E) findings is so significant that a factfinder could reasonably have formed a firm conviction or belief of the truth of the allegations that Mother had violated subsections (D) and (E).  *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28.  We therefore hold that the evidence is factually sufficient to support termination of Mother's parental rights to O.E.W.-K. under subsections (D) and (E).  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *Jordan*, 325 S.W.3d at 721–26 (holding that evidence was factually sufficient to support termination under (D) and (E) because mother allowed child to remain in the care of a person known to be violent, abusive, and a convicted sex offender;

66

endangered child as a fetus; lived an unstable, transient lifestyle; and was currently diagnosed with bipolar and other disorders and was not taking her medication); *R.W.*, 129 S.W.3d at 739–44 (holding that evidence was factually sufficient to support termination under (E) because father had a history of substance abuse, mental instability, and criminal history); *In re S.A.*, No. 02-06-00253-CV, 2007 WL 1441014, at *10–11 (Tex. App.—Fort Worth May 17, 2007, no pet.) (mem. op.) (holding evidence factually sufficient to support termination under (D) and (E) because mother suffered from bipolar disorder; had a history of drug use, including during a pregnancy; had a pattern of uncontrolled anger; showed instability in her living arrangements; and had a criminal history); *Sawyer*, 2003 WL 549216, at *9 (holding that evidence was factually sufficient to support termination under (D) and (E) because mother had a history of mental illness, housing and financial instability, relationships with violent men, and drug use). We overrule Mother's second and fourth issues.

## IV. TERMINATION WAS IN O.E.W.-K.'S BEST INTEREST

In her fifth and sixth issues, Mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship was in O.E.W.-K.'s best interest. Specifically, Mother argues that it was not in O.E.W.-K.'s best interest to terminate her parental rights to him because she had completed "the array of assistance programs suggested by TDFPS," had shown her ability to be free of drugs, and had shown her desire and ability to reform herself. The record, however, reveals otherwise.

67

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (A) the desires of the child, (B) the emotional and physical needs of the child now and in the future, (C) the emotional and physical danger to the child now and in the future, (D) the parental abilities of the individuals seeking custody, (E) the programs available to assist these individuals to promote the best interest of the child, (F) the plans for the child by these individuals or by the agency seeking custody, (G) the stability

69

of the home or proposed placement, (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In analyzing the section 263.307(b) factors, the record reveals that O.E.W.-K. was six and a half at the time of trial, was repeating kindergarten, had no physical issues, but did exhibit some behavioral problems. There were fifty-eight CPS allegations against Mother in Washington, and O.E.W.-K. was living with foster parents at the time of the trial. The frequency and circumstances surrounding the harm caused to O.E.W.-K. are detailed thoroughly above, including additional harm imposed on him by Mother and Ms. Johnson during their visits. Although O.E.W.-K. mentioned during a few of the visits that he wanted to go home, the behavior that he exhibited around Mother and Ms. Johnson reflected that he was afraid of them and did not feel comfortable when they told him that he would be going home to live with them. The results of

70

Mother's psychological evaluation with Dr. Wiggins is set forth in detail above, as is the history of abusive and assaultive conduct by Mother and others in the home, Mother's drug use, and the perpetrators of the harm to O.E.W.-K. The record demonstrates that Mother was initially adamant that she would not work any services but eventually completed some of them, though she was uncooperative unless her caseworker "put her between a rock and a hard place." O.E.W.-K.'s family failed to effect positive environmental and personal changes while the suit was pending as demonstrated during the visits when Mother and Ms. Johnson were "disruptive to each other" and others and when they interrogated O.E.W.-K. to the point that he wanted to end the visits early. Mother failed to demonstrate adequate parenting skills before and after O.E.W.-K. was removed as shown by her willingness to choose drugs over him, calling him "Daddy," getting him to sleep with her after she had a bad dream, and not knowing how to appropriately interact with or discipline him. Mother said that her support system consisted of "God, me, myself, and I."

With regard to the *Holley* factors, the record reveals that it would have been too stressful on O.E.W.-K. to testify in front of Mother, but his wishes were relayed by others and are set forth above. O.E.W.-K. had overcome his speech difficulties with speech therapy and did not have any other special physical needs. O.E.W.-K.'s main emotional need was for a safe environment, which was lacking when Mother was present. O.E.W.-K. tended to wring his hands and run to the caseworker to be rescued from Mother and Ms. Johnson during visits.

71

Mother refused to take medicine to control her mental illnesses and therefore posed both an emotional and physical danger to O.E.W.-K. due to her violent mood swings. Despite completing parenting classes, Mother testified that she could see why there were concerns about her parenting O.E.W.-K. because there were problems in the past and because she was sure that there would be problems in the future. The record did not reveal specific programs that were available to assist Mother and to promote O.E.W.-K.'s best interest, other than the services that were offered to Mother, in which she did not fully participate. CPS planned to seek adoption of O.E.W.-K. by his current foster family, while Mother wanted him to live with her or her family. The record demonstrated the stability of the foster family's home environment. If O.E.W.-K. went to live with Mother, however, the stability of the home would be questionable because Mother's motel room had not been evaluated and because Mother planned to move back in with Ms. Johnson at some point, which would likely create the same volatile environment as when O.E.W.-K. was removed. Mother regularly attended the visits, but it was at those visits where it was most obvious that the existing parent-child relationship was not a proper one. Furthermore, Mother provided excuses, which were set forth above, for her failure to complete her services.

Considering the relevant statutory factors in evaluating Mother's willingness and ability to provide O.E.W.-K. with a safe environment and the *Holley* factors, we hold that the evidence is both legally and factually sufficient to

72

support the trial court's finding that termination of Mother's parental rights to O.E.W.-K. is in his best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *Sawyer*, 2003 WL 549216, at *10–11 (holding that evidence was factually sufficient to support best interest finding because mother's history of homelessness, unemployment, drug use, relationships with violent men, and refusal to get help for her mental illness did not provide assurance of stability and permanence). We therefore overrule Mother's fifth and sixth issues.[36]

## V. AWARD OF PERMANENT MANAGING CONSERVATORSHIP TO THE DEPARTMENT

In her seventh and eighth issues, Mother argues that the award of permanent managing conservatorship to the Department should be reversed if we reverse the trial court's termination order. Because we held above that the trial court did not abuse its discretion by terminating Mother's parental rights to O.E.W.-K. and because we therefore did not reverse the trial court's termination order, we need not reach Mother's seventh and eighth issues. *See* Tex. R. App. P. 47.1 (stating that appellate court need only address every issue necessary to final disposition of the appeal).

---

[36]This was not, as Mother contends, a case in which TDFPS simply preferred another family to care for O.E.W.-K. over Mother and her family; this is a case in which the evidence supported the termination.

## VI. CONCLUSION

Having overruled every issue necessary to the final disposition of this appeal, we affirm the trial court's judgment terminating Mother's parental rights to O.E.W.-K.4

SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED:  March 31, 2011